# EXHIBIT A

**GAINEY McKENNA & EGLESTON**
95 Route 17 South, Suite 310
Paramus, New Jersey 07652
(201) 225-9001
*Attorneys for Plaintiff*
**Our File No.: 170.217**
**Attorney I.D.: 024921984**

| | |
|---|---|
| SAM BARAN GEROLD, Derivatively on Behalf of CELGENE CORPORATION, | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: UNION COUNTY |
| Plaintiff, | DOCKET NO.: _____ |
| v. | |
| MARK J. ALLES, RICHARD W. BARKER, HANS BISHOP, MICHAEL W. BONNEY, MICHAEL D. CASEY, CARRIE S. COX, MICHAEL A. FRIEDMAN, JULIA A. HALLER, PATRICIA HEMINGWAY HALL, JAMES J. LOUGHLIN, ERNEST MARIO, JOHN H. WEILAND, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| Defendants, | **DEMAND FOR JURY TRIAL** |
| and, | |
| CELGENE CORPORATION, | |
| Nominal Defendant. | |

Plaintiff Sam Baran Gerold ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Nominal Defendant Celgene Corporation ("Celgene" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Celgene with the U.S. Securities and Exchange

Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of Celgene against certain of its officers and directors seeking to remedy the Director Defendants' (as defined below) breach of fiduciary duties, corporate waste and unjust enrichment that occurred from September 12, 2016 through the present (the "Relevant Period") and have caused substantial harm to Celgene.

2.      Celgene is an integrated global biopharmaceutical company engaged primarily in the discovery, development and commercialization of innovative therapies for the treatment of cancer and inflammatory diseases.

3.      Celgene's most successful drug is Revlimid, a drug for the treatment of multiple myeloma (a type of plasma cell cancer). Revlimid accounted for the majority of Celgene's sales in 2016, and its dramatic price increases have driven its revenue growth. Since 2010, the price of treatment with Revlimid has tripled to more than $20,000 per month.

4.      Revlimid will lose patent exclusivity around 2023 and generic drug manufacturers are challenging Celgene's Revlimid patents and pursuing efforts to enter the market and directly compete with this drug sooner.

5.      Based on these anticipated events, it was important to investors that the Company build their pipeline with new drugs to diversify and ultimately replace its reliance on revenues from Revlimid sales. The three most promising drugs in the Company's pipeline to replace Revlimid were:

- GED-0301 - a late-stage developmental treatment for Crohn's disease;

2

- Otezla - a commercial-stage treatment for psoriasis approved by the FDA in 2014; and

- Ozanimod - a developmental treatment for relapsing multiple sclerosis and ulcerative colitis.

6.      On September 12, 2016, and regarding GED-0301, the Company released data from an interim endoscopy trial known as "CD-001." The Company hailed the CD-001 results as demonstrating "both endoscopic improvements and clinically meaningful responses and remission at an early timepoint in this study."

7.      Over the next year the Company continued to hype GED-0301, and represented to investors that it would be able to develop the revenue streams necessary to replace Revlimid and continue the Company's growth.

8.      On October 19, 2017, the Company disclosed that it would be abandoning GE-0301 and discontinuing ongoing trials. The Company also stated that it would record a *$1.6 billion impairment charge* (with certain offsets) as a result of the drug's failure. The move followed a futility analysis by an independent Data Monitoring Committee that had determined the drug was ineffective, notwithstanding management's earlier contentions to the contrary.

9.      On this news, the price of the Company stock fell $14.63 per share to close at $121.33 per share on October 20, 2017, a one-day decline of nearly 11%.

10.      On October 27, 2017, the Company filed its third quarter 2017 Form 10-Q (the "Q3 2017 10-Q"). In the Q3 2017 10-Q, Celgene revealed that certain of its key drugs had missed expectations for the quarter. By way of example, Otezla had slowed to only 2% U.S. growth, compared to 41% year-over-year U.S. growth the prior quarter. The Company also revised by lowering its 2020 guidance.

3

11.     On this news, the price of the Company stock plummeted another $19.57 per share to close at $99.99 per share on October 26, 2017, a one-day decline of over 16%.

12.     Shortly thereafter, the Company began hyping Ozanimod with expected sales revenues in the billions of dollars.  The Company claimed that it was on track to meet its sales goals with the submission of its new drug application ("NDA") for Ozanimod to the FDA at the end of 2017.

13.     On February 27, 2018, the Company stunned investors when it revealed that the FDA had issued a Refusal to File letter for Ozanimod.

14.     On this news, the price of the Company stock dropped 9%, or $8.66 per share, to close at $87.12 per share on February 28, 2018.

## JURISDICTION

15.     This Court has personal jurisdiction over the parties in this action.

16.     This Court has subject matter jurisdiction over this action.

17.     The Court has jurisdiction over Defendants because Defendants conduct business in New Jersey.

18.     Upon information and belief to date, the matter in controversy in this action is a substantial sum or value, which includes actual monetary damages, out-of-pocket expenses, consequential monetary damages, disgorgement of Defendants' ill-gotten gains and related damages, and/or attorneys' fees, and other damages.

19.     Venue in this Court is proper because Nominal Defendant Celgene resides in Union County.

## THE PARTIES

**Plaintiff**

4

20.    **Plaintiff Sam Baran Gerold** is, and was at relevant times, a shareholder of Celgene. Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the Company.

**Nominal Defendant**

21.    **Nominal Defendant Celgene** is a biopharmaceutical company, and is headquartered in Summit, New Jersey.

**Director Defendants**

22.    **Defendant Mark J. Alles** ("Alles") has been the Chief Executive Officer ("CEO") of Celgene since March 2016 and its Chairman of the Board of Directors (the "Board") since February 6, 2018. Defendant Alles also serves as Chair of the Executive Committee. Defendant Alles previously served as the Company's President and Chief Operating Officer ("COO").

23.    **Defendant Richard W. Barker** ("Barker") was elected to the Board in January 2012 and is a member of the Audit Committee.

24.    **Defendant Hans Bishop** ("Bishop") was elected to the Board in April 2018.

25.    **Defendant Michael W. Bonney** ("Bonney") was elected to the Board in April 2015. Defendant Bonney is a member of the Executive Committee and the Nominating, Governance and Compliance Committee.

26.    **Defendant Michael D. Casey** ("Casey") was elected to the Board in August 2002. Defendant Casey is the Chair of the Nominating, Governance and Compliance Committee, a member of the Executive Committee, and a member of the Compensation and Development Committee.

27.    **Defendant Carrie S. Cox** ("Cox") was elected to the Board in December 2009 and is a member of the Compensation and Development Committee.

28.     **Defendant Michael A. Friedman** ("Friedman") was elected to the Board in February 2011 and is a member of the Nominating, Governance and Compliance Committee.

29.     **Defendant Julia A. Haller** ("Haller") was elected to the Board in October 2015 and is a member of the Audit Committee.

30.     **Defendant Patricia Hemmingway Hall** ("Hall") was elected to the Board in April 2018 and is a member of the Audit Committee.

31.     **Defendant James J. Loughlin** ("Loughlin") was elected to the Board in January 2007. Defendant Loughlin is the Chair of the Audit Committee and a member of the Compensation and Development Committee.

32.     **Defendant Ernest Mario** ("Mario") was elected to the Board in August 2007. Defendant Mario is the Chair of the Compensation and Development Committee, a member of the Nominating, Governance and Compliance Committee, and a member of the Executive Committee.

33.     **Defendant John H. Weiland** ("Weiland") was elected to the Board in February 2018 and is a member of the Audit Committee.

34.     Defendants Alles, Barker, Bishop, Bonney, Casey, Cox, Friedman, Haller, Hall, Loughlin, Mario, and Weiland are herein referred to as the "Director Defendants".

**Non-Party Defendants**

35.     Peter N. Kellogg ("Kellogg") has been the CFO of the Company since August 2014.

36.     Scott A. Smith ("Smith") has been the President and COO of the Company since April 2017. Smith previously served as the President of the Company's Global Inflammation and Immunology ("I&I") reporting segment.

37.     Nadim Ahmed ("Ahmed") has been the President of the Company's Hematology & Oncology Franchise since August 2017. Ahmed previously served as the President of the

6

Company's Worldwide Markets for the Hematology & Oncology Franchise.

38.     Terrie Curran ("Curran") has been the President of the Company's Global I&I reporting segment since April 1, 2017.  Curran previously served as the Head of World-Wide Markets for I&I.

## CELGENE'S CORPORATE GOVERNANCE

39.     As members of the Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

40.     The Company's website states in relevant part:

> The Board of Directors of Celgene Corporation (the "Company") sets high standards for the Company's employees, officers and directors.  Implicit in this philosophy is the importance of sound corporate governance.  It is the duty of the Board of Directors to serve as a prudent fiduciary for shareholders and to oversee the management of the Company's business.  To fulfill its responsibilities and to discharge its duty, the Board of Directors follows the procedures and standards that are set forth in these guidelines.  These guidelines are subject to modification from time to time as the Board of Directors deems appropriate in the best interests of the Company or as required by applicable laws and regulations.

> It then identifies the following committees:

> - Audit Committee;

> - Nominating, Governance, and Compliance Committee;

> - Compensation and Development Committee; and

> - Executive Committee – This committee has no published charter.

41.     The Company does not have a Code of Conduct or Code of Ethics, but does maintains a Corporate Responsibility and Sustainability Policy, which focuses mainly on environmental issues.

42.     The Code of Conduct or Code of Ethics states in relevant part:

> To foster good governance, Celgene will:

Establish policies and practices that support corporate governance and transparency in reporting.

Monitor compliance with our own internal policies and guidelines, including policies and guidelines that relate to sustainability and protection of the environment.

Provide periodic and publicly available reports that demonstrate our commitment to transparency, ethical conduct, and stewardship of our natural resources.

43.     The Company's Corporate Governance Guidelines provide in relevant part:

**ROLE OF THE BOARD**

The Board is responsible for oversight of the business and affairs of the Company, its long-term strategy and objectives and its management of risks. In the discharge of its general oversight responsibilities, the Board will:

Review, evaluate, and, where appropriate, approve the Company's business strategies and long-term plans, and evaluate its performance against such plans; Review, evaluate and approve major corporate actions;

Oversee management's efforts to establish and maintain for the Company appropriate standards of legal and ethical conduct, including with respect to (i) the integrity of the Company's accounting, financial reporting and finance processes and systems of internal control, and (ii) compliance with laws; and

Select, evaluate and compensate the Company's executive officers and oversee senior management succession planning.

44.     The Company's Nominating, Governance and Compliance Committee Charter

provides in relevant part:

**Responsibilities:**

The Committee shall assist the Board of Directors by:

*          *          *

Reviewing the Company's public disclosures regarding matters overseen by the Committee...

*          *          *

Developing and recommending to the Board such corporate governance guidelines, including changes to such guidelines that the Committee deems

appropriate

Overseeing the Company's corporate compliance efforts, excluding financial compliance (including financial reporting and the requirements of the U.S. Foreign Corrupt Practices Act), which shall continue to be the responsibility of the Audit Committee.

45.     Celgene's Audit Committee Charter provides in relevant part:

Legal Compliance

On at least an annual basis, review with the Company's legal counsel, Internal Audit Executive, Chief Compliance Officer, other members of management and/or independent auditors, as applicable, (i) any legal matters, including inquiries received from regulators or governmental agencies, that could have a significant impact on the Company's financial statements, and (ii) the Company's financial compliance (including financial reporting and the requirements of the U.S. Foreign Corrupt Practices Act.

## DUTIES OF THE DIRECTOR DEFENDANTS

46.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner.  The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

47.     Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

48.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)     Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     Conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     Properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     Remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     Ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)      Ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

49.      Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

50.      The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements as alleged herein.  As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits.

## SUBSTANTIVE ALLEGATIONS

### Background and Materially False and Misleading Statements

51.      For years, the Company sustained its growth through price increases of Revlimid, and through controversial sales practices.  For example;

(a)      The price of treatment with Revlimid has tripled since 2010 to approximately $20,000 a month.

(b)      In July 2017, the Company agreed to pay $280 million to settle a whistleblower lawsuit that claimed the Company had defrauded the government and knowingly pushed Revlimid and Thalomid for unapproved off-label uses.

52.     Revlimid will lose patent exclusivity around 2023 and generic drug manufacturers are challenging the Company's Revlimid patents and pursuing efforts to enter the market and directly compete with this drug sooner.  By way of example, in 2015, the Company settled with one of its competitors, Natco Pharma Ltd., and agreed to allow it to sell a limited quantity of Revlimid generics beginning in 2022.

53.     When the Company's patent for Revlimid expires, cheaper generic versions of the drug will be able to enter the market, create competition and drive down the cost of Revlimid, and impacting the Company's revenues and expected future cash flows.

54.     Based on these anticipated events, it was important to investors that the Company build its pipeline with new drugs to diversify and relieve its reliance on revenues from Revlimid sales.  The three most promising drugs in the Company's pipeline to replace Revlimid were GED-0301, Otezla, and Ozanimod.

**GED-0301**

55.     GED-0301 is a developmental treatment for Crohn's disease.  In April 2014, the Company purchased GED-0301 from Nogra, an Irish pharmaceutical company, for $710 million following a Phase II Trial.

56.     Later, after the full trial results were published in March 2015, the Company and its representatives continued to tout the drug's potential.  For example, following the publication and presentation of the trial's primary findings, Scott A. Smith stated that "'[t]he analysis . . . suggests that patients with more severe Crohn's disease or a longer duration of disease were able to achieve clinical response or clinical remission with the 160 mg dose of GED-0301.'"

57.     While most analysts accepted the positive views of management, the Company went to great lengths to dispel investors' concerns about the viability of GED-0301 as it launched a Phase

III Trial, known as "CD-002." In the months following the drug's acquisition, the Company's representatives began touting GED-0301 as "a multibillion-dollar asset" and, together with Otezla (which was approved to treat psoriasis in 2014) and Ozanimod (a multiple sclerosis drug under development), as a "replacement" for Revlimid.

58.     In January 2015, the Company unveiled a five-year strategic plan to express management's "confidence" in the Company's continued revenue growth.  As part of this guidance, the Company projected $21 billion of net product sales by 2020, or nearly triple the Company's total net product sales for fiscal 2014, which included hundreds of millions of dollars of sales from GED-0301 and an expansion in sales of Otezla.  Sales of I&I, which included GED-0301, Ozanimod and Otezla, were projected to grow to $3 billion.

59.     On a January 29, 2015 analyst conference call discussing the new guidance and the Company's recent financial results, the Company's then-President of Global Hematology & Oncology, Jackie Fouse, stated: "The results of these [new indication] efforts will drive not only our short-term growth trajectory, but they also position us extremely well to sustain that growth, one reason we feel highly confident in our vision out to 2020."

60.     On September 12, 2016, the Company issued a press release entitled "Celgene Announces Interim Topline Data from Trial of Investigational Oral GED-0301 in Patients with Active Crohn's Disease."  The release discussed the topline results from an interim endoscopy trial, CD-001, that had enrolled 63 patients with moderate to severe Crohn's disease.  The release stated that the "*[d]ata show endoscopic improvement and clinical response and remission at week 12*." The release also stated in pertinent part:

> Celgene Corporation today announced interim topline data from a randomized, double-blind, multicenter, exploratory phase 1b study evaluating the effects of oral GED-0301 (mongersen) on both endoscopic and clinical outcomes in patients with active Crohn's disease.

The trial, CD-001, is an ongoing study evaluating three different treatment regimens of GED-0301 in a 12-week treatment phase, followed by an observation phase up to 52 weeks (off treatment). The primary objective of the study is to explore the effect of GED-0301 on endoscopic outcomes. The trial enrolled a total of 63 patients across multiple countries.

The study was designed to further enhance the understanding of GED-0301 activity in a difficult-to-treat, moderate-to-severe patient population. This population was more diverse than prior GED-0301 studies and included patients with endoscopically confirmed mucosal damage at entry and those who had previous surgeries. The study also included both biologic exposed and biologic naïve patients as well as patients with a diagnosis of Ileitis, Ileocolitis or colitis.

Topline data from CD-001 show that in a proportion of patients treated with oral GED-0301 there was endoscopic improvement (defined as a 25 percent improvement from baseline) and clinical response and remission across all treatment groups at week 12. Findings to date reveal no new safety signals and tolerability is consistent with earlier studies.

"Given the high unmet need in Crohn's disease, we are pleased that oral GED-0301 showed both endoscopic improvements and clinically meaningful responses and remission at an early timepoint in this study," said Scott Smith, President of Celgene Inflammation and Immunology. "These data are particularly encouraging for several reasons, including the difficult-to-treat patient population evaluated in the trial."

"At this early 12-week timepoint, we're looking at the proportion of patients who had a 25 percent or greater endoscopic improvement, suggesting mucosal healing is underway in these patients," said Dr. William Sandborn, M.D., Professor of Medicine and Chief, Division of Gastroenterology and Director, University of California San Diego Inflammatory Bowel Disease Center. "These data support the notion that GED-0301, a potential first-in-class oral antisense therapy, may target an underlying cause of Crohn's disease, rather than simply improving symptoms."

Full data from the 12-week timepoint have been submitted for presentation at an upcoming scientific meeting later this year. The CD-001 study is ongoing until all patients complete the observation phase. Data from the observation portion of the trial are expected in 2017. The Phase III registration program is ongoing.

**About CD-001**

CD-001 is a phase 1b randomized, double-blind, multicenter, exploratory study evaluating the effects of oral GED-0301 on endoscopic and clinical outcomes in patients with active Crohn's disease. A total of 63 patients were randomized in a 1:1:1 ratio to receive one of three treatment regimens in a 12-week treatment phase: GED-0301 160 mg once daily for 12 weeks; GED-0301 160 mg once daily for eight

weeks followed by four weeks of placebo; or GED-0301 160 mg once daily for four weeks followed by eight weeks of placebo. This treatment phase was followed by an off-treatment observation phase for up to 52 weeks. Eligible patients can also enter an extension phase (on treatment) for an additional 24 weeks.

61.     By enrolling patients with more severe Crohn's disease across a wider variety of test sites, the study was designed to address and dispel investor concerns related to the earlier phase II trial results.

62.     While some analysts questioned the study's lack of a placebo control arm, the Company pushed back against these concerns. For example, speaking at an analyst conference on September 12, 2016, Smith dismissed any issues with the study's design because of the more extensive disease at baseline of the patients in the study and stressed that the results were meaningful and indicative of the drug's efficacy and supported the Company's design of the phase III trial, CD-002:

> So we kept a very topline, *we were very, very encouraged by what we saw in the particular study. We saw endoscopic improvements, clinical responses and clinical remissions across all three groups.*
>
> \*      \*      \*
>
> *I would expect the placebo rate in this particular population, this study from an endoscopic perspective to be very, very low.* This confirms significant extensive disease at baseline, you wouldn't expect the placebo patients to be getting better, you'd probably expect the majority of them [to be] getting worse over that 12-week period, it would be unlikely that you would get many responses. *So you would expect a low placebo rate* given what we've done here, so what you'd want is to be able to feel good that you could separate from placebo and show statistically significant effects in our large powered study than you would achieve that end point.
>
> And having looked at all, and our interpretation of data is we feel very comfortable around the size, the structure and the timing of the Phase III program given that we've just – given the data that we've just seen. [Emphasis added].

63.     In October 2016, the Company presented more details of the interim endoscopy trial results at the United European Gastroenterology Week conference.

64.    On October 17, 2016, the Company summarized this presentation in a press release entitled "Oral GED-0301 Phase 1b Results Show Clinical Remission and Endoscopic Response at Week 12 in Patients with Active Crohn's Disease."   The press release stated that "Clinical improvement [was] observed early, with highest clinical response and remission rates in the 12-week treatment group."   The release also stated that patients with the most severe endoscopic disease activity had shown the greatest response to treatment, with 63% exhibiting a 25% or greater reduction in their SES-CD score, the study's primary marker of efficacy.   Smith was quoted in the release as stating: "'We are encouraged that oral GED-0301 showed both *meaningful endoscopic improvement and clinical remission* at an early time point in this study . . . .'"   The press release continued in relevant part:

Celgene International Sàrl, a wholly-owned subsidiary of Celgene Corporation (NASDAQ: CELG), today announced that data from a randomized, double-blind, multicenter, exploratory phase 1b study evaluating the effects of investigational oral GED-0301 (mongersen) 160 mg on both endoscopic response and clinical remission in patients with active Crohn's disease will be presented in Vienna, Austria at the United European Gastroenterology Week (UEGW).

Patients with active Crohn's disease [Crohn's disease activity index (CDAI) score 220-450], a total simple endoscopic score for Crohn's disease (SES-CD) ≥7, or an ileal disease SES-CD ≥4, were randomized to three different active treatment regimens of four, eight or 12 weeks of GED-0301 160 mg daily, followed by an observation period off treatment. Endoscopic and clinical assessments were reported through week 12. A total of 63 patients were enrolled in the study.

The study was designed to further enhance the understanding of GED-0301 activity in a difficult-to-treat, moderate to severe patient population. This population was more diverse than prior GED-0301 studies and included patients with endoscopically confirmed mucosal damage at entry and those who had previous surgeries.  The study also included both biologic-exposed and biologic-naïve patients, as well as patients with a diagnosis of Ileitis, Ileocolitis or colitis.

Clinical improvement was seen by week 2, and clinical response (CDAI decrease ≥100) and remission (CDAI < 150) rates were highest in the 12-week treatment group at 67 and 48 percent respectively, at week 12.  The mean CDAI reduction from baseline at week 12 in the 12-week treatment group was 133 points. Of the patients with evaluable endoscopies at week 12 (n=52), 37 percent had an endoscopic

response (≥25 percent reduction in SES-CD score from baseline), with no meaningful difference across treatment groups. In addition, of those patients with greater endoscopic disease activity at baseline (SES-CD score of > 12; n=16), 63 percent exhibited a reduction ≥25 percent in SES-CD score and 31 percent had a reduction of ≥50 percent.

The rates of adverse events and serious adverse events were low and similar across treatment groups.  There were no new safety signals for oral GED-0301 160 mg daily reported in this study.

"A significant number of Crohn's disease patients don't reach remission with current therapies or will suffer relapses over time and are in need of new treatment options," said Brian Feagan, MD, Director of Robarts Clinical Trials at Robarts Research Institute, Western University, London, Ontario, Canada.  "Based on these findings, oral GED-0301 has the potential to provide a new, oral option with a novel mechanism of action designed to act locally."

"We are encouraged that oral GED-0301 showed both meaningful endoscopic improvement and clinical remission at an early time point in this study," said Scott Smith, President, Celgene Inflammation & Immunology. "The fact that this study included nearly 50 percent biologic-experienced patients further reflects the potential of GED- 0301 as a novel approach for patients with Crohn's disease searching for alternatives."

65.     During the call, one analyst questioned why the Company had failed to include a control placebo arm, asking, "I guess I am wondering just what's the best defense here that there is a true drug effect as opposed to just a reversion to the mean in a patient population that's very severe at the baseline?"  Smith responded, as he had earlier, that the lack of a placebo control arm did not take away from the import of the results or the integrity of the trial's design:

If you take a look at a number of different things, it was a little bit patient poor, but data rich, as we look at things, which was the reason for not having a placebo arm.

When I take a look at this particular study, you see in a relatively heterogeneous, more severe, more difficult to treat population, you see a very positive sign in terms of clinical response and clinical remission, a very validating of what we have seen in the IGON program [i.e., the phase II trial].  And then when you take a look at the other markers at week 12, which is an early time point for endoscopic healing and endoscopic response, you see signs of endoscopic improvement in all three treatment groups and you see biomarkers generally going in the right direction.

So that cumulative evidence really tells you that not only are you having a pretty

significant effect from a response and remission standpoint, but you are also seeing everything go in the direction that you would like to see it go. And then also from an endoscopic perspective, you are seeing sort of the largest responses in the patients with most extensive disease, which I think is a very positive sign of drug activity as well.

66.    A doctor involved in the study design presenting on behalf of the Company, William Sandborn, echoed these justifications for the lack of a control arm, stating that the endoscopic placebo effect for patients with the baseline severity of those in the study "tends to be nearly zero," and that, as a result, the trial's data were "all pretty reassuring."

67.    On October 27, 2016, the Company issued a press release announcing its financial results for the quarter ended September 30, 2016. The Company reported net product sales of approximately $2.97 billion. Defendant Alles was quoted in the release as stating: "'Continued outstanding execution by our teams around the world led to another strong quarter of revenue growth and progress advancing many of our most important strategic programs . . . . Our increasing enterprise-wide momentum has us on-track to exceed key 2016 objectives and positions us well for sustained long-term growth.'"

68.    Also, on October 27, 2016, the Company hosted an earnings conference call to discuss the quarterly results. On the call, the Company continued to tout the interim CD-001 trial data and the promise of GED-0301. For example, Defendant Alles stated that the recent results "continue to demonstrate this *transformative potential* of . . . GED-301 in Crohn's disease." Similarly, Smith stated: "The CD-001 results are generally consistent with the clinical outcome seen in the placebo controlled IGON program," which provided "compelling evidence to view GED-0301 as a potentially transformational therapy." He continued, "[o]nce confirmed in pivotal programs, *we are confident this product will be transformational for patient care*."

69.    In the following months, the Company repeatedly hailed GED-0301 as one of the

Company's most promising treatments and important assets. For example, during a November 15, 2016 analyst conference, Smith stated in relevant part:

> We see a tremendous opportunity for GED in the marketplace.

> \* \* \*

> So you get the data and I was very, very pleased with the data. I mean, it showed that the drug is continuing to work. You see really high levels of clinical response and clinical remission. And then we saw what we wanted to see from an endoscopic perspective, which is patients seeing improvement in their endoscopic scores and biomarkers moving in the right direction.

> \* \* \*

> And in this case, we saw something going on.

> And the other thing I think that was very interesting is 63% of patients who had extensive disease saw 25% improvements in SES-CD score, which is sort of what you are after and what you're looking at. The SES-CD is a little harder to read with patients with less severe disease. But when they have extensive disease, that's when you can get a real handle on whether the drug is working. We saw 63% of patients with 25% improvement.

> So we were very, very pleased with that study. I think it showed the drug works in all kinds of different patients.

> \* \* \*

> So for me, the GED program is just so exciting. It's such a different type of therapeutic than has been in the market. You see different responses and remission rates than you see with anything else. And then it's an oral drug, non-systemically absorbed. In the Phase II program, the side effects look like placebo in that case. There's a real opportunity for this to really change the whole shape of the market in terms of IBD.

70.     Likewise, Defendant Alles stated during a January 9, 2017 analyst conference that GED-0301, together with Otezla and Ozanimod, provided "an opportunity to, literally, ***change the entire landscape*** of how these diseases are treated over the next year to 10 years" and a "fantastic opportunity for us to create a ***multibillion-dollar add on*** to our current product portfolio." Defendant Alles continued:

We've developed unique partnerships with so many collaborators and scientists that we feel very, very good about our pipeline. Our mission and vision is clear. And when I think about our strategy of adding and accelerating to our core strengths, we are in a great position to continue to grow; not only for 2017 and into 2020, but into the next decade and beyond.

71.     On January 26, 2017, the Company issued a press release announcing its financial results for the quarter and year ended December 31, 2016. The Company reported net product sales of $2.98 billion for the quarter and $11.18 billion for the year. The press release also provided guidance for 2017 of $13.0 billion to $13.4 billion in total revenues, including $1.5 billion to $1.7 billion in net sales for Otezla. Defendant Alles stated: "'2016 was an outstanding year of progress strengthening our commercial portfolio and advancing our early-, mid- and late-stage pipeline . . . . We expect our business momentum and significant near-term catalysts to drive high growth through 2017 and beyond.'"

72.     Also, on January 26, 2017, the Company hosted an earnings conference call to discuss the quarterly and annual results. On the call, Smith stated: "This year we expect to fully enroll critical studies in our IBD program, including the large treat-through pivotal trial for GED 301 in the treatment of Crohn's disease. We are very excited about the transformational potential of this novel oral treatment approach in an area of very high unmet medical need."

73.     On April 27, 2017, the Company issued a press release announcing its financial results for the quarter ended March 31, 2017. The Company reported net product sales of $2.95 billion for the quarter. The press release also raised adjusted earnings per share ("EPS") guidance for 2017, from a range of $7.10 to $7.25 to a range of $7.15 to $7.30. Defendant Alles stated: "'Our significant first quarter operational, financial and strategic progress strengthen our confidence and outlook for 2017 . . . . Our business momentum is increasing as we continue to generate meaningful catalysts and long-term value drivers.'"

74.     Also, on April 27, 2017, the Company hosted an earnings conference call to discuss the quarterly results. On the call, the Company claimed that subsequent data from CD-001 had continued to validate GED-0301's efficacy, further confirming that Celgene and its top management had reviewed data and analysis from the trial that was not publicly available. For example, Smith stated that he was "very, very" excited about the "tremendous potential" of GED-0301 following his receipt of more undisclosed interim trial data:

> There is a sort of an encore presentation of some of the GED, CD-001 data upcoming, which takes a look at the relationship between clinical remission and endoscopic improvements. And so I can't give specifics to that data, but that will be presented at DDW coming up. *So we're excited about that. We're very, very – we've got data for GED, obviously*, and for ozanimod. *We're very excited* about both assets. The GED registration program has really accelerated over the last little while. We remain on track with time lines there, and we think *there's tremendous potential*. Before you finalize positioning, you would want to see and make sure that you have the data from both GED and from ozanimod in Crohn's. I think there is some real positives on the mongersen or GED side in terms of the nonsystemic absorption characteristics of the product, which could make it really, I think, a very good product, both to be used early first line, but also to be used in combination or in combinatorial approaches with other agents in the marketplace. Because again, it's got a very unique mechanism and nonsystemically absorbs. So *we're very, very excited* about both these assets.

75.     On the call, Defendant Alles tied the results to the Company's revenue potential and 2020 guidance, stating: "[a]ll that said, *we remain very confident that we're on track to meet or exceed 2020*."

76.     In subsequent months, the Company continued to tout GED-0301's transformative potential and its ability to replace Revlimid revenues. For example, during a May 17, 2017 analyst conference, Kellogg stated:

> And as we get the data, for example, for ozanimod, for GED-301, for luspatercept, for idiphenyl, and so on, those different products that are coming through both our collaboration partners and our own pipeline. That will create kind of the – on the curve, *that will create the new growth drivers that, quite frankly, I think will allow us to grow as we go through the next decade quite nicely*. So it's an exciting time. *I think there is a lot of investor interest in that late stage pipeline for that exact*

*reason and it's appropriate. And we're actually very optimistic.* So I think that's exactly strategically what we want to be focused on. We've got the investors watching the right things, which I think is super. And we're looking forward to kind of having the data come through over the next 18 months.

77.     Similarly, during a May 31, 2017 analyst conference, Defendant Alles stated: "So beginning with GED-0301, our oligonucleotide that is only absorbed in the colon, and *we've had some great Phase II data* for the products." Defendant Alles also claimed that GED-0301, together with Otezla and Ozanimod, would ultimately serve as a "replacement" for Revlimid revenues, stating in pertinent part:

> If I just look at the inflammatory bowel disease franchise, and I look at the 3 products, OTEZLA, ozanimod and GED-0301, in a mix of puts and takes on thinking about success there, all of those molecules with the potential to launch before or around 2020, that revenue alone, *that opportunity alone can offset all of not the annual REVLIMID sales*, right, but whatever the peak is. *This is a replacement for it.*

78.     On July 27, 2017, the Company issued a press release announcing its financial results for the quarter ended June 30, 2017. The Company reported net product sales of $3.26 billion for the quarter, which included $358 million in Otezla sales, a 49% increase year-over-year. The press release again raised adjusted EPS guidance for 2017, from a range of $7.15 to $7.30 to a range of $7.25 to $7.35. Defendant Alles stated: "'We delivered outstanding second quarter results and significantly advanced our high-potential pipeline . . . . Exceptional execution of key strategic initiatives strengthened and expanded our opportunities for long-term growth.'"

79.     Also, on July 27, 2017, the Company hosted an earnings conference call to discuss the quarterly results. On the call, the Company characterized GED-0301, Ozanimod and Otezla as driving the Company's growth to meet its 2020 guidance and beyond. For example, Defendant Alles stated:

> Our second quarter results were outstanding and a strong indicator that our constant focus on operating excellence and innovation has us extremely well positioned to

*achieve or exceed our full year 2017 financial targets and continues to support our 2020 outlook*.  Given the significant momentum of our blockbuster medicines and the expanding leverage of our business model, we are raising our 2017 adjusted earnings per share guidance to a range of $7.25 to $7.35, up from our previous target of $7.15 to $7.30.

80.     On the call, Curran, who had replaced Smith as the head of Celgene's I&I segment, described GED-0301 as one of the Company's "***next generation growth drivers***." Similarly, Smith stated that the Company was "***seeing tremendous momentum in our I&I franchise***[,] as we continue to expand the utilization and access of OTEZLA globally," and "***continued strong execution of*** our pivotal IBD programs: ***GED-0301*** in Crohn's disease."

81.     Kellogg made similar rosy statements about the ability of the Company's key products to drive future growth on the call:

> A fantastic quarter.  We delivered outstanding results in the second quarter and have great momentum to finish up the year in great shape. But even more important for all of us in the room here, while we continue to drive great top line growth, great bottom line growth and P&L leverage, we are also significantly advancing our [pipeline] and executing on key strategic initiatives that ***really set up the platform for long-term growth through 2020 and into the whole next decade***. And I think you can see a lot of the questions we had today, quite frankly, are about ***the assets that are going to drive us past 2020 and really create a tremendous growth story for us***, and that's what we're all working hard on.

82.     Following the call, the Company repeatedly claimed during multiple investor meetings and analyst conferences that GED-0301 would be a multi-billion dollar replacement for Revlimid, the Company would meet its 2020 guidance, and that positive sales trends for Otezla had continued from prior quarters.  For example, during an August 9, 2017 conference call, Kellogg stated that the Company was "***right on track so far***" with its 2020 guidance.

83.     Similarly, during a September 13, 2017 investor conference, Defendant Alles continued to hold up GED-0301, Otezla and Ozanimod as key replacements for Revlimid and drivers of future Company sales, stating in pertinent part:

We've turned that ability to generate innovative molecules into a broader, diversified portfolio with 8 therapies approved, OTEZLA, for example, in psoriatic arthritis, increasingly a pipeline of inflammatory bowel disease drugs like GED-0301, ozanimod, et cetera.

. . . [O]ver the next decade and beyond, we're positioned to continue to have high growth.

*       *       *

So this company now is positioned with the kind of optionality opportunity for growth that's sustained not only to our outlook to 2020 where we remain very confident, but beyond the loss of exclusivity of our flagship product, REVLIMID.

84.     During an analyst call the next day, Kellogg made an even more in-depth pitch touting the Company's pipeline products, including GED-0301 and Ozanimod, and the purported continued momentum of Otezla sales throughout the quarter, stating, in pertinent part, that the Company just wanted to be "as transparent as we can with investors" and that

we've been building up a tremendously powerful and rich pipeline, and that is really an important criteria for Celgene's future, is to have a strong pipeline as we go into the next decade. And we feel very strongly about that, and I'll highlight some of the dimensions of that in just a minute.

*       *       *

[A]s we go from today to 2020, where we've given guidance to have our revenue above $21 billion, we're going to be primarily driven by the main core commercial assets that we have and some of the early emergence of our pipeline assets like ozanimod, GED-0301, et cetera. And they're just beginning to ramp up, and that will constitute kind of the vision through 2020. . . . But these will be the assets that will drive our business through those events and create kind of a nice growth profile for Celgene throughout the entire next decade.

. . . But ozanimod, GED-0301, JCAR017, very interestingly, the anti-CD19 program and so on, right? You see here some very, very high potential programs. . . .

So overall, listen, we have great momentum with our key commercial assets that are already in place and are driving. We've given guidance to 2020. We feel very good about that guidance and continue to execute well on those programs. We have a number of pipeline catalysts that create a sense of inflection opportunity for us that will be clearly visible in the next 18 months probably at this point.

\*       \*       \*

[T]he commercial assets that were included in that 2020 guidance are on track doing really well. I think everybody would agree with that. The story of Rev, Pom, ABRAXANE, OTEZLA, that really played out beautifully. . . . Obviously, the commercial assets we have are doing very well.

85.     Kellogg also reiterated his confidence that the Company would meet its 2020 guidance and that it was laying the groundwork for its "growth story for the next decade," stating in pertinent part:

I think giving guidance out to 2020, when we did it, I will admit it was pretty long term. And certainly, have set a new standard for long-term guidance. But the reason we're able to do that is because so much of our commercial profile and our revenue profile was being dictated by the assets that are already on the market, already approved the indications that were there. And we were just helping investors understand that, that was something that we had a fair level of confidence in. I think that when you go beyond 2020, where you want to enhance it, really it's more dependent on the pipeline results. And so I think this makes a lot of sense. *We like to be as transparent as we can with investors*. It helps them understand kind of the thought of how to value Celgene. And also what it does is it kind of solves kind of the first time horizon in terms of this is what you should expect from the company in terms of the financial performance; and gets a lot of investors thinking about the next time horizon, kind of *past 2020, where, in fact, these pipeline of assets that I showed you in my presentation today start to all come through and you can start to think about how they might build the growth story for the next decade*. I think that is where our valuation is really hinging right now. People do appreciate Rev, Pom and those drugs. But when I think about my 2020 PE or what the valuation is looking beyond 2020, I think that's where there's still a lot of opportunity for growth and the company's value.

86.     As late as September 26, 2017, with only four days left in the third quarter, the Company continued to represent that the GED-0301 trials were showing tremendous promise, that Otezla continued to perform above expectations, and that management was confident it would meet or exceed its 2020 guidance.  On that date, Ahmed spoke at an analyst investor conference on all three topics.  During his presentation, Ahmed claimed that Celgene and its management now had even greater "visibility" into the revenue potential of GED-0301 and Ozanimod and the current sales for Otezla, among other ongoing trends in the business, which made them "very, very confident

about 2020 in terms of meeting or exceeding our expectations." He stated the following in pertinent

part:

> I did want to start with our mission statement, though. And I think for me, this is a story of both constancy and dynamism. So in terms of being constant, so we continue our intense focus on delivering, researching and commercializing products against the highest unmet needs. And it needs to be dynamic because we're a company that really continues to follow the science wherever that may take us.

> \*       \*       \*

> I'd also like to say that the story today is going to be about momentum and inflection. When I refer to momentum, that's the momentum currently of our in-line brands as we think about 2020, and inflection because now we have greater insight into our pipeline, we can now start to think about 2020 and beyond.

> \*       \*       \*

> So if you think about 2014, GED; 2015, receptors; EngMab last year, so we're able to make all of these acquisitions but still grow our top line and manage our bottom line extremely, extremely well. And really, it's our current in-line brand momentum and our visibility to the pipeline that helps us feel very, very confident about 2020 in terms of meeting or exceeding our expectations.

> Over the next 2 years, we're going to see key inflection points for the growth of Celgene in the future. We have made a Phase III data, data readouts over the next 2 years. And also, the pipeline visibility now gives us some idea of what pipeline products we think will land in that 2020 time frame and then what are the blockbuster potential products for the future as we think of loss of exclusivity for our major brands. So next 2 years are pivotal for Celgene both in terms of our brand momentum and also the emergence of our pipeline.

> We feel that we have a very deep and rich pipeline across all stages of development. And really, our strategy focuses on where are the places that we can win, how can we build category-leading franchises with category-leading brands? And if you look at all of these disease segments, ranging from myeloma to solid tumors to I&I, you can see we're on this journey where we're building franchises around key products in the marketplace.

> The other thing I'd say also is now that we are starting to get greater visibility into our pipeline, as we think about that time period between 2020 and 2030, we've got multiple products landing both on the early side of that in terms of 2020 but also blockbuster products that take us from 2020 to 2030 as we think about the LOE of our current in-line brands.

\*       \*       \*

I'm now going to turn our focus to our newest and just as exciting franchise in I&I. We believe – again, using the anchor molecule of OTEZLA, where we've seen great success, we believe we have another opportunity to transform many diseases in this space with our suite of products. Going back to OTEZLA. I think the thing that has been done very well here is that we've offered a unique value proposition with this brand to carve out a very unique space in this market, i.e., the prebiological space. And as we think about our metrics around launch for OTEZLA, the momentum is going very, very well. Now we have access secured in Europe and Japan. And so our ex U.S. sales are growing at a greater than 100% clip. So we're very, very happy with where OTEZLA is in the marketplace.

\*       \*       \*

And I'll say again, we feel very, very good about our pipeline across franchises. And now that we have visibility to the emerging data, we feel good about the contribution to 2020 from our pipeline, but even more importantly, about the contribution of our pipeline from 2020 into the next decade.

I spoke about the pivotal inflection points. And so again, that sweet spot of going beyond 2020, our pipeline is rapidly emerging. Even as we think about 2020, we will have 15 brands approved on the market, which doubles the commercial portfolio that we have today.

And as you think about the individual molecules, we have, in the next few years, 12 molecules that can be approved, we've already checked off IDHIFA, 10 of those with $1 billion-plus potential, 4 of those with a multibillion dollar-plus potential. So we're feeling very, very good about the promise of our pipeline.

And lastly, to close out this discussion, we started talking about momentum. So again, reaffirming our 2020 guidance, I'm feeling very, very good and confident about the momentum that we have with our inline brands as we think about 2020.

We spoke about inflection. And I think now, with the insight into our emerging pipeline, we feel very good about inflection that our pipeline offers to both 2020 and beyond. And I think – we started with our mission statement. We will continue relentless and bold pursuits in the area of science, including acquisitions, business development activities. And I think by doing this, we feel very, very good about the strength and the position that Celgene occupies in the marketplace not just today, not just 2020, but into the next decade, from 2020 to 2030 and beyond.

87.     The statements referenced above were materially false and/or misleading when made

because they misrepresented and/or failed to disclose the following adverse facts pertaining to the

Company's business, operations and financial condition, which were known to the Director Defendants or recklessly disregarded by them. Specifically, the Company failed to disclose:

(a)    that the CD-001 interim endoscopy trial suffered from fatal design defects, including, *inter alia*, insufficient patient size and lack of a placebo control arm, that prevented the trial from providing meaningful data regarding the efficacy for GED-0301 or for informing the proper design of the ongoing CD-002 phase III trial;

(b)    that GED-0301 had failed to demonstrate meaningful clinical efficacy through the interim endoscopy trial because of the trial's design defects and because the primary marker of efficacy used in CD-001 – 25% endoscopic improvement from baseline – was insufficient to indicate clinically meaningful improvement when accounting for placebo effects;

(c)    that non-public interim trial data received and analyzed by Celgene and its representatives demonstrated GED-0301's lack of efficacy and a revision to baseline in the treated patient population;

(d)    that, as a result of (a)-(c), there was an undisclosed risk and high likelihood that Celgene would be unable to develop GED-0301 into a commercially viable treatment for Crohn's disease;

(e)    that the growth of Otezla sales had dramatically slowed during the Company's third fiscal quarter of 2017, from 41% annual growth for U.S. sales in the second quarter of 2017 to only 2% annual growth during the third quarter;

(f)    that international sales for Otezla had grown only 87% year-over year during the third quarter of 2017, far below the "greater than 100% clip" represented to investors, and such adverse sales trends were worsening;

(g)     that, as a result of (a)-(f) above, the Company was not on track to achieve its

2017 or 2020 fiscal guidance, and such guidance lacked a reasonable basis

## THE TRUTH BEGINS TO EMERGE

88.     On October 19, 2017, the Company issued a press release entitled "Celgene Provides

Update on GED-0301 (mongersen) Inflammatory Bowel Disease Program." The release stated that

the Company would be discontinuing the GED-0301 trials for the treatment of Crohn's disease

following a futility analysis by an independent Data Monitoring Committee. A report on Form 8-K

filed that same day stated that Celgene expected to record a $1.6 billion impairment charge (with

certain offsets) as a result of the drug's failure.

89.     On this news, the price of the Company stock fell $14.63 per share to close at $121.33

per share on October 20, 2017, a one-day decline of nearly 11%, on abnormally heavy trading

volume.

90.     Approximately one week later, on October 26, 2017, the Company issued a press

release announcing its third quarter 2017 financial results. The results missed expectations, with

total net product sales of only $3.28 billion, representing less than 1% growth from the prior quarter.

The Company also revealed that Otezla sales had actually *declined* compared to the second quarter,

from $358 million to $308 million, a drop of nearly 14%. The slowdown in Otezla's U.S. sales

growth was particularly striking, as it had slowed to only 2% annual growth in the third quarter,

compared to a 41% annual growth rate in the second quarter. Similarly, the Company's international

sales had fallen to only 87% growth year-over-year.

91.     The Company also slashed its 2017 and 2020 fiscal guidance, which the Company

had repeatedly reaffirmed, including as recently as one month before – at a time when they *already*

*had* almost the entirety of the Company's third quarter results. Total sales from Otezla were now

29

projected to be only $1.25 billion for 2017, a greater than *21% reduction* from the mid-point of the prior guidance range. Worse still, the Company revised downward its 2020 guidance as a result of the poor results and the loss of projected GED-0301 revenues. While guidance for total product sales was lowered from $21 billion to a range of $19 billion to $20 billion, management *raised* projections for Revlimid and its existing hematology products, with these drugs' proportion of overall sales increasing from 62% in the original guidance to up to 77% of total projected product sales in the revised guidance. Consequently, the Company revealed that it was much more dependent on Revlimid sales for its future success than previously disclosed. Total I&I sales (which included GED-0301 and Otezla) were now projected to be between $2.6 billion to $2.8 billion, when they had previously been slated to exceed $4 billion.

92.     On this news, the price of the Company stock plummeted $19.57 per share to close at $99.99 per share on October 26, 2017, a one-day decline of over 16%, on abnormally high trading volume.

93.     The market's reaction was swift and severe, resulting in the loss of billions of dollars in market capitalization in the span of a week. Several analysts downgraded the stock, with market commentators characterizing the results as "*disastrous*" and "*truly catastrophic*." One J.P. Morgan analyst noted that "management faces a major credibility issue." Likewise, a Cowen analyst wrote that investors were "likely to be very concerned," as they had relied on management to "provide an accurate description" of Otezla sales and the reported shortfall "is likely to impact the company's credibility." According to investor news service *Seeking Alpha*, the Company's third quarter results had "shocked investors," as "the Street has suddenly lost trust in Celgene's pipeline as well as the credibility of management's guidance."

94.     Despite the stock price declines as a result of these adverse disclosures, the price of

the Company stock remained artificially inflated as the Company continued to misrepresent and/or

conceal material information from investors. Specifically, the Company sought to reassure investors

by claiming that the approval of the Company's third purported revenue driver in its I&I segment,

Ozanimod, would offset the lost GED-0301 opportunity and declining Otezla sales and serve as a

replacement for Revlimid revenues. However, the Company failed to disclose that it had not

collected sufficient nonclinical and clinical pharmacology data for Ozanimod in recent clinical trials

to allow for FDA review. Instead, the Company continued to represent that the NDA for Ozanimod

would be sent to the FDA by the end of the year, despite this lack of data, in order to allay investor

concerns over the Company's operational setbacks.

95.     For example, on October 26, 2017, during the same conference call in which the

Company revealed its disappointing third quarter financial results, the Company pointed to the

potential of Ozanimod. In his prepared remarks, Defendant Alles stated in pertinent part:

> While sales of GED-0301 were relatively modest in our 2020 model, we did forecast
> multi-billion dollar peak sales potential. We are encouraged by the recently
> presented ozanimod Phase II data in Crohn's disease and expect to initiate a Phase III
> study of this novel agent in Crohn's within the next few months. We are committed
> to building a leading inflammatory bowel disease franchise, *now led by ozanimod*,
> for the treatment of ulcerative colitis and Crohn's and perhaps OTEZLA in one or
> both of these serious unmet medical conditions. *And this immediate shift from
> GED-0301 to ozanimod in Crohn's disease is a great example of the pipeline
> optionality and opportunity we have built and continue to build into our research
> model for hematology, oncology and inflammation and immunology.*

96.     During the same call, Curran stated that the Company had continued to make "good

progress" in developing Ozanimod and that the drug "*remains on track for regulatory submission*,

beginning with the U.S. by year-end and the EMEA in the first half of 2019."

97.     Two days later, on October 28, 2017, the Company held a conference call with

investors focused on Ozanimod and recent trial results that would underpin the Company's

submission to the FDA. On the call, Curran stated that Ozanimod could become a key driver in

31

several areas and a "best-in-class" treatment option for patients.  Curran stated in pertinent part:

> So before we get into the presentations, it's really exciting to be finally here in Paris and able to share the Phase III data.  But important to say that ozanimod doesn't just have a future in MS, but will become a potential key driver for the I&I franchise in both neuroscience and gastroenterology and dermatology and rheumatology.

> If you look at the neuroscience segment of the market, it really will be a cornerstone product in RMS and has the potential to be the best-in-class oral.  As you saw over the last couple of days, we've demonstrated superiority versus Avonex across multiple key endpoints in both the trials, and we believe we have a differentiated risk benefit profile, which we'll talk a little bit more about through the – about during the presentation.

98.     The Company also highlighted the quality of the data that Celgene would be submitting to the FDA as part of the NDA for Ozanimod.  For example, Company representatives Jeffrey Cohen and Philippe Martin stated, respectively, that the data was obtained through "***very rigorously performed trials***," which would "form the basis of [Celgene's] submission to the FDA and to EMA."  Curran, after highlighting the "market opportunities" for Ozanimod, again stated that the Company was on track "to fil[e] or submit [a] filing by the end of the year in the U.S. and the EMEA the first half of next year."  When asked by an analyst whether the Company had "enough data" on Ozanimod for a favorable label determination from the FDA, Company representative Philippe Martin responded that the "***data we have is particularly compelling in our minds***." Similarly, Smith stated that the data Celgene had collected for Ozanimod was the "***best case scenario for being able to make a really positive, strong argument [to the FDA] and certainly we will***."

99.     On November 7, 2017, the Company hosted another conference call with investors, during which Kellogg touted the "very promising" and "detailed data for ozanimod in multiple sclerosis." Kellogg described Ozanimod as a "***high-potential asset*** []," and stated that he was "relatively ***bullish*** on the opportunity for multiple sclerosis."

100.    The Company increased their rhetoric promoting Ozanimod after the Company submitted the NDA for the drug to the FDA at the end of 2017.  On a January 8, 2018 conference call, Defendant Alles called Ozanimod the "*platform molecule* for the company," a "*multibillion-dollar blockbuster*," and a "*derisked asset*" because of its multiple potential applications.  In his prepared remarks, Defendant Alles once again highlighted the quality of the data the Company had submitted to the FDA in seeking the drug's approval:

> And of course, in neurosciences, we're very proud and pleased with the results of the 2 Phase III trials that were released last year and presented at ECTRIMS late in the year. We believe that the efficacy from these 2 trials comparing ozanimod to Avonex in relapsing-remitting MS *presents a highly favorable and competitive position for the brand, starting with the efficacy and then moving through the favorable safety and tolerability profile*. We are very excited about it. *As I said, the NDA was submitted the end of last year. We look forward to working with the FDA to bring this molecule to patients in the U.S.* and then around the world as quickly as possible.

101.    Similarly, during this same call, Curran called Ozanimod a "*foundational compound in neurology*." Smith, meanwhile, stated that the drug had the potential to meet "*tremendous unmet medical need now*."

102.    During a January 25, 2018 conference call, Curran stated that the data submitted to the FDA "*support a differentiated clinical profile*" and that the Company was "preparing for a world-class launch in the RMS market" for Ozanimod.  She continued, "*With ozanimod, we are planning to secure FDA approval in RMS by year-end* and to submit international registration dossiers in 2018 starting with Europe in Q1."  Later, in response to an analyst question about potential monitoring requirements for Ozanimod, Curran stated: "*Clearly, from the data, we have a highly differentiated compound both in terms of efficacy, safety and tolerability*.  So we'll continue to discuss the potential label with the authorities but at this case – at this stage that is the base case."

103.    Smith likewise pointed to the Company's "*execution*" on Ozanimod and the fact that

33

it had submitted "*the NDA for ozanimod and RMS . . . on the heels of 2 positive global Phase III studies*." He also stated that Celgene was "currently building out a strong neuroinflammation team to execute a launch and *unlock the value of this important product*." Smith, likewise, represented that Ozanimod together with the Company's other pipeline products "*could yield over $16 billion in incremental peak revenue* through 2030."

104.   On February 7, 2018, the Company filed its financial results on Form 10-K for the quarter and year ended December 31, 2017. The Form 10-K described Ozanimod as "*a potential best-in-class S1P receptor modulator*" and stated that the Company had submitted an NDA for Ozanimod to the FDA in December 2017 "based on data from the phase III trials evaluating ozanimod in patients with RMS."

105.   Then, on February 27, 2018, after the market closed, the Company issued a press release revealing that the FDA had sent a Refusal to File letter for the Company's NDA for Ozanimod. The release stated that *both* the clinical and nonclinical pharmacology data were insufficient to even permit a complete review by the FDA:

> Upon its preliminary review, the FDA determined that the nonclinical and clinical pharmacology sections in the NDA were insufficient to permit a complete review. Celgene intends to seek immediate guidance, including requesting a Type A meeting with the FDA, to ascertain what additional information will be required to resubmit the NDA.

106.   On this news, the price of the Company stock fell $8.66 per share to close at $87.12 per share on February 28, 2018, a one-day decline of over 9%, on abnormally high trading volume.

107.   Market commentators panned the announcement. An analyst at *Seeking Alpha* called the news "hard to accept as a reality," because receiving a Refusal to File letter is "*almost unheard of for a major company*." Likewise, an analyst at Leerink stated that "*Celgene could have seen this coming*" and "'*clearly made a decision to file this application at risk*, despite late information that

might have been more thoroughly disclosed and explored in the application, had the filing been

postponed by a few months.'"

108.   As a result of these disclosures, the price of the Company stock dropped more than

40%.

109.   On August 7, 2017, the Company filed a Form 8-K with the SEC, which attached an

Updated Business Disclosure as Exhibit 99.1.  In the Form 8-K, Celgene stated in relevant part:

> As previously reported, Celgene Pharmaceuticals, Inc. (the "Company") met with the
> U.S. Food and Drug Administration (the "FDA") in July 2018 to continue their
> discussions on the BLA submission being prepared for Celgene™ as a treatment of
> the signs and symptoms of severe (KL 4) osteoarthritis of the knee (OAK) and
> received a letter from the FDA with respect thereto. Accordingly, the Company is
> filing this information with this Current Report on Form 8-K for the purpose of
> updating the description of certain aspects of its business from the disclosure
> contained in the Company's prior filings with the SEC, including the Company's
> most recent Annual Report on Form 10-K for the year ended December 31, 2017,
> filed with the SEC on March 6, 2018. The updated disclosures are filed herewith as
> Exhibit 99.1 and are incorporated herein by reference.

110.   Of note, neither the Form 8-K or Updated Business Disclosure reveals the date of the

FDA letter to Celgene where it stated that "…it does not consider the AP-003-C trial to be an

adequate and well-controlled clinical trial."

111.   On this news, shares of the Company fell $2.25 per share or over 78% to close at

$0.61 per share on August 8, 2018.  Shares continued to fall another 21.3% the next day.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

112.   Plaintiff brings this action derivatively in the right and for the benefit of the Company

to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of

fiduciary duties, corporate waste and unjust enrichment by the Director Defendants.

113.   Plaintiff will adequately and fairly represent the interests of the Company and its

shareholders in enforcing and prosecuting its rights and has retained counsel competent and

experienced in derivative litigation.

114.    Plaintiff is a current owner of the Company stock and has continuously been an owner of Company stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein.  Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

115.    During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Director Defendants.  Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

116.    The Company Board is currently comprised of twelve (12) members – Alles, Barker, Bishop, Bonney, Casey, Cox, Friedman, Haller, Hall, Loughlin, Mario, and Weiland.  Thus, Plaintiff is required to show that a majority of the Director Defendants, *i.e.*, six (6), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

117.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

118.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

119.    Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized

and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

120.    The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act

### The Director Defendants Are Not Independent or Disinterested

121.    Each of the Director Defendants has already conceded through their individual SEC filings that they are holders of the Company stock and/or have a vested interest in stock options exercisable in the near future and, thus, have conflicts between their pecuniary interests and those of the Company shareholders at large such that the Board does not have a majority of disinterested and/or independent members.  As set forth herein, the Director Defendants have acknowledged that they have concealed and obfuscated the efficacy of the Company's GED-0301 development and the ability of Ozanimod and Otezla "pipeline product stream" to supplant the revenue flow currently occupied by Revlimid in the near and/or long-term horizon.  A majority of the Director Defendants could not have independently and disinterestedly investigated the claims alleged herein.  As such, it would be totally unreasonable to expect Plaintiff to make a demand on these directors, who have already conceded that they are not disinterested and/or independent.

122.    In addition, the Director Defendants have already conceded that they do not have a majority of disinterested and/or independent members. As set forth herein, under the terms of the Nominating, Governance and Compliance Committee, the Compensation and Development

Committee, and the Company's Audit Committee, Barker, Bonney, Casey, Cox, Friedman, Haller, Hall, Loughlin, Mario, and Weiland were and remain expressly authorized to conduct investigations related to, among other things, the Company's falsification and misreporting of the Company's GED-0301 and Ozanimod clinical drug trials upon which the Company hinged its future financial success. In these positions, these Defendants also had non-public information regarding the underperformance of its Otezla psoriasis treatment product.

123.    Further, Alles, Barker, Bishop, Bonney, Casey, Cox, Friedman, Kaplan, Loughlin, and Mario (each of whom served on the Board's Nominating, Governance, Compliance, Compensation and/or Audit Committees during the Relevant Period) are interested because they face a substantial likelihood of liability for their conduct on the Board as a result of their integral roles in the concealment of the Company's GED-0301 and Ozanimod failed clinical drug trials and lacking Otezla sales revenue. Accordingly, their personal potential liability for the acts (and failures to act) alleged herein casts doubt about their ability to disinterestedly evaluate a demand.

**Defendant Alles**

124.    Defendant Alles is not disinterested or independent and is incapable of considering any demand. Defendant Alles is also the CEO of the Company and derives substantially all of his income from his employment with the Company, making him not independent. Defendant Alles is also a defendant in the securities class action now pending entitled *City of Warren General Employees' Retirement System v. Celgene Corp., et al.*, Civil Action: No.: 2:18-cv-04772 (D.N.J.) ("Securities Class Action").

125.    As such, Defendant Alles cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

## FIRST CAUSE OF ACTION

### Against The Director Defendants for Breach of Fiduciary Duties

126.   Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

127.   The Director Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Director Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

128.   The Director Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

129.   The Director Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Director Defendants breached their fiduciary duties of loyalty and good faith by:

(a)   allowing the Company to engage in an off-label marketing campaign;

(b)   permitting the Company to ignore the most basic scientific standards when conducting important clinical studies;

(c)   allowing unacceptable filings to the FDA, resulting in a Refuse to File;

(d)   permitting fundamentally false and misleading information to be disseminated to investors; and

(e)   failing to investigate these failures and take remedial action.

130.   As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

131.   As a direct and proximate result of the Director Defendants' breach of their fiduciary

duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION

### (Against The Director Defendants for Waste of Corporate Assets)

132. Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein.

133. The Director Defendants knowingly, intentionally, recklessly, or negligently breached their fiduciary duties and, thereby, caused the Company to waste its assets, expend millions of dollars of corporate funds, and impair its reputation and credibility for no legitimate business purpose, as a result of which Celgene has been and continues to be substantially damaged.

134. In light of their deficient performance in supervising controls and financial affairs of the Company, the Director Defendants have wasted corporate assets by overly compensating themselves and the Company's executives during times when the Company was materially misstated its performance to the investing public.

135. Accordingly, the Director Defendants should be required to make the Company whole for such waste.

## THIRD CAUSE OF ACTION

### (Against The Director Defendants for Unjust Enrichment)

136. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

137. By their wrongful acts and omissions, the Directors Defendants were unjustly

40

enriched at the expense of and to the detriment of the Company.

138.    The Director Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to the Company.

139.    Plaintiff, as a shareholder and representative of the Company, seeks restitution from the Director Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by the Director Defendants from their wrongful conduct and fiduciary breaches.

140.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.    Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.    Declaring that the Director Defendants have breached their fiduciary duties and participated and/or aided and abetted the breach of their fiduciary duties as alleged herein;

C.    Awarding, against all the Director Defendants and in favor of the Company, the damages sustained by the Company as a result of Defendants' breaches of their fiduciary duties;

D.    Requiring the Director Defendants to remit to Celgene all of their salaries and other compensation received for the periods when they breached their duties;

E.    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors

from a recurrence of the damaging events described herein;

F.    Awarding pre-judgment and post-judgment interest as allowed by law;

G.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: October 11, 2018

## DESIGNATION OF TRIAL COUNSEL

Pursuant to Rule 4:25-4, BARRY J. GAINEY, is hereby designated trial counsel in the within cause of action.

Dated: October 11, 2018

BARRY J. GAINEY, ESQ.
*Attorney for Plaintiffs*

## CERTIFICATION PURSUANT TO RULE 4:5-1

The undersigned hereby certifies that there are two matters that were filed in Federal Court arising out of the same general fact pattern. One is a claim for securities fraud and the other is a derivative action. The derivative action is in the District of New Jersey under Docket No. 2:18-cv-11589. The case caption is Saratoga Advantage Trust Health & Biotechnology Portfolio v. Alles, et al. The securities fraud case is in the District of New Jersey under Docket No. 2:18-cv-04772. The case caption is In re Celgene Corporation, Inc. Securities Litigation. The undersigned also certifies that there are no other parties required to be joined to this action at this time.

Dated: October 11, 2018

BARRY J. GAINEY, ESQ.
*Attorney for Plaintiffs*

Respectfully submitted,

**GAINEY McKENNA & EGLESTON**

By: _____
Barry J. Gainey, Esq.
95 Route 17 South, Suite 310
Paramus, New Jersey 07652
Telephone: (201) 225-9001
Facsimile: (201) 225-9002
Email: bgainey@gme-law.com
Attorney No.: 024921984
***Counsel for Plaintiff***

<u>**Of Counsel**</u>:
Thomas J. McKenna
Gregory M. Egleston
**GAINEY McKENNA & EGESTON**
440 Park Avenue South, 5th Floor
New York, New York 10016
Phone: (212) 983-1300
Fax: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

-and-

Justin Kuehn
**MOORE KUEHN, PLLC**
30 Wall Street, 8th Floor
New York, NY 10005
Phone: (212) 709-8245
Email: jkuehn@moorekuehn.com

## VERIFICATION

I, SAM BARAN GEROLD, am a plaintiff in the within action.  I have reviewed the allegations made in this Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this ___9th___ day of October 2018.

SAM BARAN GEROLD